## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**BARRY FERGUSON**                                        **CIVIL ACTION**

**VERSUS**                                                **NO.:  14-1835**

**N. BURL CAIN, WARDEN**                                  **SECTION:  "E"(5)**

### REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.   Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2).[1]  For the following reasons, **IT IS RECOMMENDED** that the petition for *habeas corpus* relief be **DISMISSED WITH PREJUDICE**.

I.      ***Procedural and Factual History***

Petitioner, Barry Ferguson, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.[2]   On July 31, 2003, Ferguson was charged by bill of indictment with first degree murder pursuant to Louisiana Revised Statute 14:30.[3]  On

---

[1]28 U.S.C. § 2254(e)(2), an evidentiary hearing is held only when the petitioner shows either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, or that the claim relies on a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

[2]Rec. Doc. No. 4, Petition.

[3]State Rec., Vol. 1 of 39, Bill of Indictment, 7/31/03.

August 15, 2003, Ferguson pleaded not guilty.[4]   After nearly six years, multiple pre-trial

hearings, and an extensive jury voir dire process, his case finally proceeded to trial on April

14, 2009.[5]   The following lengthy facts were established at trial and summarized by the

Louisiana Fourth Circuit Court of Appeal:[6]

>    On the afternoon of Friday, May 23, 2003, the defendant and his sixteen-year-old daughter, Brandy Ferguson, left their home in Kenner, Louisiana to see a movie. Mrs. Kris Ferguson, the defendant's wife and Brandy's stepmother, testified that when she called the defendant's cell phone later that evening, she heard screams that lasted for approximately one minute. Mrs. Ferguson asked  Brandy if she was okay and if she could hear her, and she heard Brandy groan as if someone had knocked the wind out of her before the cell phone went dead.
>
>    In the early morning hours of Saturday May 24, 2003, several motorists telephoned the NOPD's 911 complaint operator and related seeing a man flagging down motorists on the I–610 between the Canal Boulevard and St. Bernard Avenue exits, and the body of what appeared to be a dead female on the shoulder of the road. At approximately 1:00 a.m., Detective Sergeant Joseph Waguespack arrived at the reported location and found the distraught defendant standing on the shoulder of the road beside Brandy's body.
>
>    Herbert Carver, who made one of the 911 calls on the night of the homicide, testified at trial. Mr. Carver testified that he related to the operator that a man was standing in the right-hand lane of the I–610 just beyond the overpass and was attempting to stop traffic. As Mr. Carver passed the man, he noticed a body lying on the side of the roadway. When Mr. Carver stopped his vehicle, he advised the defendant that he had called 911 and to get out of the roadway. Mr. Carver testified that he approached the victim's body, which was face down in the grass, touched her shoulder and concluded that she was dead. Mr. Carver further testified that the upper part of the victim's body was clothed, but the lower portion was nude. The defendant was intoxicated and would not speak to Mr. Carver. When the police and EMS arrived, Mr. Carver explained the events he observed.

---

[4]State Rec., Vol. 1 of 39, Minute Entry, 8/15/03.

[5]State Rec., Vol. 1 of 39, Minute Entry, 4/14/09; State Rec., Vol. 30 of 39, Trial Transcript, 4/14/09.

[6]*State v. Ferguson*, 54 So. 3d 152, 154(c)-66 (La. App. 4 Cir. 2010) *writ denied*, 63 So. 3d 1008 (La. 2011) (footnotes in original).

Sergeant Joseph Waguespack testified that he was a commander at the homicide unit at the time of the victim's death and heard the police radio broadcast about a man standing on the I–610 trying to flag down motorists and the presence of a body on the side of the road. When he arrived at approximately 1:05 a.m. on May 24, 2003, EMS was already on the scene. Sgt. Waguespack testified that he observed the victim's body in a prone position, face down in the grass. He surveyed the area and found a white paper bag containing a Styrofoam box of what appeared to be Chinese food, and approximately eighty-five feet from the container, a blue hair scrunchy, tennis shoes, a pair of blue jeans, and a multi-colored pair of women's underwear with one side of the strap torn off.

Sgt. Waguespack testified that the defendant told him that the victim was his daughter, Brandy, and that they had attempted to see a movie, and then walked around the shopping mall before arriving at the Daiquiri Shop, where they spoke with two black males. The defendant also informed him that after stopping at the Daiquiri Shop, he and the victim then walked to the McDonald's on Veterans Highway where they met the same two men, who gave the defendant and Brandy a ride to the Shell Station on Veterans Highway and Downs Boulevard, where they encountered Jessica Bazile and Samer Abumusa.

Sgt. Waguepack testified that defendant stated that Ms. Bazile and Mr. Abumusa drove him and Brandy to I–10 and Causeway Boulevard, where the two black males in a red car picked them up, at which time one of the men stole the defendant's gold necklace and pushed him from their car, telling him that he would find his daughter up the road a short distance. The defendant told Sgt. Waguespack that he walked along the roadway for about ten minutes and came upon the lifeless body of his daughter and pulled her body to the curb.

Sgt. Waguespack testified that he observed that the defendant was intoxicated, and when he asked the defendant questions to clarify the conflicting and vague information the defendant was giving him, the defendant became irate, combative, and uncooperative, even physically accosting Sgt. Waguespack and Detective Michael Sam. Unable to calm the defendant, Sgt. Waguespack enlisted the aid of Detective Sam, who handcuffed the defendant and placed him in the police vehicle. Sgt. Waguespack testified that he arrested the defendant for two counts of battery on police officers and public intoxication, and had him transported to Central Lockup, and then directed crime lab technicians in processing the scene and collecting evidence. Sgt. Waguespack spoke to the defendant at Central Lockup to glean more information, but the defendant was uncooperative and demanded an attorney, at which time all conversation ceased.

At trial, Sgt. Waguespack identified photographs of the scene and the victim's body, explaining the objects depicted in the photographs and their positions at the scene. Sgt. Waguespack further testified that he directed

Detective Sam and Detective Andre Giles to confiscate the defendant's clothing at the police station and place it in Central Evidence and Property.

In the course of the investigation, Sgt. Waguespack spoke with an employee at an Asian restaurant in the Esplanade Mall who recognized a picture of the victim. Sgt. Waguespack testified that she said she remembered serving the defendant and the victim at the restaurant around 6:00 p.m. on Friday, May 23, 2003. Sgt. Waguespack also spoke with an employee at the Daiquiri Shop on Veterans Boulevard, who recognized the victim and the defendant as having visited the shop, and especially remembered them because he asked the victim for identification to verify her age. The Daiquiri Shop employee recalled that the defendant became belligerent and told the employee, "She's my daughter, she don't have to show you anything" and then left the shop. Sgt. Waguespack's investigation also led to video footage of the defendant and the victim at the Daiquiri Shop and also on the RTA bus in Kenner.

Around 6:30 a.m. on May 24, 2003, Sgt. Waguespack returned to the crime scene and inspected the area for evidence, discovering the defendant's cell phone near the spot where the victim's clothing was found. That same day, Sgt. Waguespack observed the victim's autopsy, which revealed that the contents of her stomach matched the food in the container confiscated at the crime scene. Sgt. Waguespack obtained the victim's gold necklace bearing the name "Brandy" and gave it to her grandmother. Sgt. Waguespack testified that he observed the necklace on the victim's body at the wake.

The Sunday after the victim died, Sgt. Waguespack met with the defendant's brothers, Frank and Kenny Ferguson, at their request, to view the crime scene and learn about the investigation. Later that afternoon, Sgt. Waguespack went to Central Evidence and Property to look at the clothes the defendant had worn the night of the crime. The clothes—a pair of white socks, blue jean shorts and a pair of jockey-type underwear—had been placed in a plastic bag. Sgt. Waguespack testified that he repackaged the clothing into a paper bag because moisture buildup in a plastic bag can possibly degrade the evidence. After repackaging the clothes, Sgt. Waguespack reattached the original evidence tags.

When examining the clothing, Sgt. Waguespack testified that he observed that the underwear was stained with what he recognized as blood, but observed no blood on the blue jean shorts. Sgt. Waguespack concluded that the only way blood would have gotten on the underwear would be if the person who raped and murdered the victim placed the underwear back on the victim after the attack. Sgt. Waguespack contacted Detective Giles and instructed him to process the paperwork to charge the defendant.

Sgt. Waguespack visited Mrs. Audrey Ferguson at her home and obtained pre-arranged taped statements from Audrey and her sons, Frank and Kenny Ferguson. Sgt. Waguespack testified that he interviewed no less than twenty-two witnesses to establish a timeline of events leading up to the victim's death. Among the witnesses he spoke to was State Trooper Paul

Boychin, who supplied Sgt. Waguespack with the video tape of his encounter with the defendant and the victim at 10:00 p.m. the night of the homicide. Also during the course of the investigation, Sgt. Waguespack testified that he obtained a search warrant to collect blood, saliva, and head and pubic hairs to submit for DNA evidence. With the help of Dr. Jerry Rosenberg of the Orleans Parish Prison, the evidence was collected and logged into Central Evidence and Property. As part of the ongoing investigation, Sgt. Waguespack testified that he received the results from serology and DNA testing in connection with the case, and that the results reinforced his suspicion that the defendant raped and murdered his daughter.

Mrs. Loretta Lynn Gillman, Brandy's mother, testified at trial, stating that she and the defendant were married for two or three years, and that Brandy was born of that union. The couple divorced when Brandy was about three years old. Mrs. Gillman relinquished custody of Brandy to the defendant and had very little contact with her until Brandy became a teenager, at which time the victim and Mrs. Gillman would talk on the phone every weekend. Mrs. Gillman said that Brandy was "slow" like her, meaning that Brandy needed special supervision in school and at home.

Samer Abumusa and his girlfriend, Jessica Bazile, also testified at trial regarding their encounter with the defendant and the victim at the Shell gas station at Downs Boulevard and Veterans Boulevard in Kenner on the evening of May 23, 2003. Ms. Bazile testified that the defendant, carrying a six-pack of beer, approached the couple and asked if she and Mr. Abumusa would drive him and his daughter to Florida. Ms. Bazile recognized Brandy as someone she had gone to school with, and Mr. Abumusa recognized Brandy as someone from his neighborhood. Ms. Bazile testified that they advised the defendant that they could not go as far as Florida, but that they could give him a ride to the Bonnabel Boulevard exit of the interstate. Mr. Abumusa drove, and Ms. Bazile sat in the front passenger seat. The defendant sat in the back seat behind Mr. Abumusa, and Brandy sat behind Ms. Bazile. As the foursome rode, Ms. Bazile testified that she observed that the defendant was intoxicated and was touching Brandy in an inappropriate manner, and not behaving like a father toward his daughter.

Ms. Bazile further testified that when she asked Brandy if she was all right, she responded "yeah" and confirmed that the defendant was her father. During the duration of the trip, about thirty to forty minutes, the defendant's cell phone rang repeatedly, but the defendant did not answer it. Ms. Bazile also testified that she could tell something was wrong by Brandy's behavior, and noticed that the defendant kept telling Brandy to have a beer and "let loose," but that Brandy refused, saying she was too young to drink.

Ms. Bazile further testified that Brandy and the defendant continued to argue about drinking until the defendant asked to be let out of the car on the interstate near the Bonnabel Boulevard exit, but then changed his mind and asked to be let out of the car at the end of the exit ramp because "he and his girl couldn't handle their business" on the interstate.

Mr. Abumusa testified that the defendant was a belligerent drunk who repeatedly asked him and Ms. Bazile to party with him, and that he told them he knew where to get the drugs. Mr. Abumusa also testified that the defendant's phone was ringing the entire time that he and Brandy were riding in his vehicle. He recalled that it was approximately 9:00 p.m. when they saw Brandy and the defendant at the gas station. Upon learning of Brandy's death, Ms. Bazile and Mr. Abumusa contacted the police and gave recorded statements to the police. Both witnesses identified pictures of Brandy and the defendant.

Following Mr. Abumusa's testimony, the State and the defense entered into three stipulations. First, they stipulated that the copy of the Daiquiri Shop video was a true and accurate portrayal of the events that happened the evening of May 23, 2003. The video was played for the jury. Second, the State and the defense stipulated that if crime scene technician Robin Rucinski were called to testify, she would testify that she took photographs of the crime scene, drew a sketch, and made note of minutes from the defendant's cell phone. Third, the State and the defense stipulated that if crime lab technician Steven Villere were called to testify, he would confirm that he appeared on the scene, and that he took a series of photographs, collected certain items of evidence, which were logged into Central Evidence and Property, and also prepared a sketch of the scene.

Dr. Alvaro Hunt testified as an expert in the field of forensic pathology that he was employed by the Orleans Parish Coroner's Office and performed the autopsy on Brandy Ferguson on May 24, 2003 at 9:15 a.m. Dr. Hunt stated that Brandy was five feet, three inches tall and weighed 123 pounds. Dr. Hunt classified Brandy's death as a homicide, and noted the cause of death as manual strangulation. Dr. Hunt stated that death by manual strangulation can be caused by either applying enough force to the arteries in the neck to occlude the blood supply to the brain or completely occluding the windpipe itself, causing suffocation. He stated that complete occlusion of the windpipe is difficult to achieve due to its cartilaginous structure and the struggle of the victim when he or she becomes air hungry; it can take several minutes for the victim to die in this manner.

During the autopsy, Dr. Hunt observed that Brandy's entire face was discolored due to its suffusion with blood and that her neck showed a small bruise on either side underneath the jaw. Dr. Hunt testified that he also observed what he believed to be fingernail abrasions on her neck, and concluded that Brandy had been strangled from the front. Dr. Hunt further testified that he also observed marked swelling of Brandy's left cheek and extensive hemorrhaging around her left eye, which he opined was caused by a single blow of significant force. Dr. Hunt noted that the lower half of Brandy's body came to him nude and that she was wearing a brassiere that had been pulled up to her neck, and that her necklace, a small gold chain with the name "Brandy", was bent backwards in several places, probably as a result of the strangulation itself.

Dr. Hunt observed clotted blood on Brandy's thighs as well as a large amount of non-clotted blood outside Brandy's vagina, on her inner thigh and buttocks, and in the crease of her buttocks, and determined that, in all probability, the non-clotted blood had continued to seep from the lesions found inside Brandy's vagina. Dr. Hunt further testified that the vaginal injuries were new, and that he discovered a hemorrhage of one of the ligaments that attached Brandy's uterus to the pelvis, which he had never seen before. In his opinion, such trauma was likely the result of "very forceful penetration of the vagina, such that the cervix … was moved," causing the ligaments to stretch, and that such damage could only be caused by penetration.

Dr. Hunt also testified that Brandy's brain was swollen due to hemorrhaging of the blood vessels, and that her back was covered with small linear abrasions as well as a large amount of dirt and grass and a moderate number of ants. Inspecting Brandy's windpipe, Dr. Hunt noted extensive bleeding around the vocal cord as well as a cartilage fracture on the inside of the windpipe, which he stated was consistent with manual strangulation. Dr. Hunt had only seen such cartilage fractures in one previous manual strangulation case that he could recall and testified that it takes an unusual amount of force to produce such injury. On the mid-portion of Brandy's collarbone, Dr. Hunt further testified that he observed deep bruising and hemorrhaging, which he attributed to the fracturing of her windpipe, and also noted hemorrhaging in Brandy's temporalis muscles, which he testified was "highly characteristic in forms of [manual] strangulation" where the blood flow is cut off from the head and upper neck. There was no evidence of tearing or laceration of the anus.

Dr. Hunt also collected blood, urine, and vitreous fluid from Bandy's body and presented it to the Coroner's toxicology laboratory to test for the presence of drugs or alcohol in her system. The toxicology results indicated that no alcohol or drugs were present in Brandy's blood. Dr. Hunt also concluded a "P–30 test" to test for the presence of seminal fluid in Brandy's vagina, anus, and mouth, which were all negative.[7] Dr. Hunt explained that this was not necessarily evidence that penetration did not occur because the perpetrator may have been wearing a condom or have been sterile.

On cross-examination, Dr. Hunt testified that a person being manually strangled would be able to scream unless the windpipe was completely blocked. He also testified that the struggle could leave defensive marks on the attacker. Dr. Hunt further testified that he had discovered from discussions with attorneys in the years since Brandy's murder that she was

---

[7]The test confirmed that Brandy's blood type was "B".

at the end of her menstrual cycle at the time of her death; however, menstrual blood is distinguishable from arterial blood because it is darker and may contain small blood clots and liquid blood, and also contains small amounts of blueish-to-brown tissue from the uterine lining itself. Dr. Hunt testified that he did not perform a microscopic examination of the blood found in Brandy's uterus to determine its origin because he was able to tell from the freshness of her vaginal lacerations that they were the most likely source of the blood.

Dr. Hunt agreed that hemorrhaging of the broadband ligaments could occur through consensual intercourse, but that it would have to be an unusually aggressive form of consensual intercourse, and stated that the bleeding in this case occurred within twenty-four hours of the autopsy. Dr. Hunt acknowledged that such vaginal injuries need not necessarily have been caused by penile penetration, but could have been caused by a foreign object. On re-direct examination, Dr. Hunt testified that Brandy's vagina showed common signs of being immediately post-menstrual or in the last twenty-four hours of the menstrual cycle. He also stated that he was unable to take clippings from Brandy's fingernails to test for the presence of DNA because her nails were bitten or cut so deeply back that there was no specimen to take.

Ms. Terrell Perkins was employed as a Regional Transit Authority bus driver on May 23, 2003. The bus was fitted with both visual and audio surveillance equipment. Ms. Perkins testified that the defendant and the victim boarded her bus at the Esplanade Mall in Kenner, at which time the defendant began to question Ms. Perkins about her off-duty activities, and wanted to know if there was a daiquiri shop in the area. The defendant told Ms. Perkins that it was the victim's birthday and that he wanted to get her a tattoo below her navel. He then asked if Ms. Perkins would like to join him and his fiancée in a "threesome" and made other lewd comments. Ms. Perkins testified that she found the defendant's conduct inappropriate because he touched the victim's arm in a manner which made her uncomfortable, and noticed that as the defendant and the victim exited the bus, the victim seemed apprehensive about getting off with the defendant. Ms. Perkins testified that she overheard the victim tell the defendant that she did not want to go to a daiquiri shop. After the homicide, Ms. Perkins met with an NOPD homicide detective and identified photographs of both the victim and the defendant.

Louisiana State Trooper Paul Voitier also testified at trial. At approximately 9:45 p.m. on May 23, 2003, Trooper Voitier was driving westbound on I–610 when he spotted the defendant and the victim walking on the shoulder of the road near the Bonnabel Boulevard exit. Upon seeing the defendant and the victim, Trooper Voitier circled around on the interstate and activated his emergency lights, which activated his car's video surveillance camera. Trooper Voitier testified that he approached the defendant and the victim as they walked on the eastbound I–610 overpass, at

which time the defendant informed him that he and the victim were on their way to Florida. For their safety, Trooper Voitier drove the pair off the interstate at the Canal Boulevard exit.

EMS technicians Yolanda Wilson and Joe Glorioso responded to the emergency call in this case and testified at trial. When Ms. Wilson arrived on the scene, the defendant appeared frantic and intoxicated, and told her that he and the victim were walking to Florida, when they were picked up by a motorist and then thrown from the car. Joe Glorioso's testimony corroborated Ms. Wilson's recitation of events, but added that the victim was dead by the time they reached the scene, and that her body was face down in a grassy area on the side of the interstate. Mr. Glorioso testified that he learned from the intoxicated defendant that he was the victim's father, and that the defendant also told him that he and the victim were picked up by a man who subsequently forced him from the vehicle, so he walked along the interstate until he came upon the victim's body.

Ms. Claudia Richards, a passenger on the RTA bus with the defendant and the victim, also testified at trial. Ms. Richards was employed by Dillard's Department Store in the Esplanade Mall on May 23, 2003, and boarded the bus at the mall. As the bus proceeded on its route, Ms. Richards testified that the defendant appeared intoxicated and was speaking very loudly, and that the defendant also propositioned the bus driver for sex. The victim and the defendant exited the bus at the Daiquiri Shop shortly after they got on the bus. The next day, Ms. Richards saw the victim's picture in the paper with an article requesting anyone who had any information about the crime to contact the NOPD, which she did, and was interviewed by Sgt. Waguespack.

Mrs. Kris Ferguson, who had been married to the defendant for six years, also testified at trial. Ms. Ferguson testified that she, the defendant, and Brandy were living with the defendant's mother, Audrey Ferguson, in Kenner at the time of Brandy's death. Mrs. Ferguson had gotten off from work between 7:00 and 8:00 p.m. on May 23, 2003. When she arrived home, only Audrey was there. Although she was aware that the defendant had planned to take Brandy to a movie at the mall, Mrs. Ferguson testified that she spoke with the defendant on his cell phone before she left work and learned that he and Brandy were not allowed into the movie theater because they had drinks. Mrs. Ferguson testified that she thought the defendant seemed drunk when they spoke on the phone, and told him that it was okay if he wanted to go drinking that night, but that he had to bring Brandy home beforehand. Mrs. Ferguson had spoken with Brandy earlier in the evening, and at that time Brandy told her she was all right.

Mrs. Ferguson testified that she and her mother-in-law, Audrey, tried to call the defendant that night approximately twenty times; although his phone would pick up, no one would answer before it disconnected. Mrs. Ferguson could hear Brandy saying, "Daddy, I love you," and "Daddy, watch out." When Brandy and the defendant had not returned home by 10:00 p.m., she began calling his cell phone every five minutes, but the response was the

9

same. As Mrs. Ferguson continued to call she thought she heard someone giving directions and background noises such as cars driving over an overpass, which lead her to believe that Brandy and the defendant were somewhere on the interstate.

Mrs. Ferguson testified that later that evening, as she continued to call the defendant's cell phone, she heard curdling screams for approximately one minute. She asked Brandy if she could hear her, and suddenly heard Brandy groan as if someone had knocked the wind out of her before the phone went dead. Afraid that someone might have been beating up or murdering Brandy, Mrs. Ferguson called the Kenner Police while her mother-in-law continued attempting to reach Brandy.[8] Mrs. Ferguson then called one of the defendant's brothers, and one of them went with Mrs. Audrey Ferguson to look for Brandy. Later that night, she received a phone call from a detective informing her that Brandy had been found dead. Mrs. Ferguson testified that she had no knowledge of any plans the defendant and Brandy had to go to Florida that weekend. Mrs. Ferguson confirmed that Brandy was a special education student.

New Orleans Police Officer Michael Sam responded to the call in the early morning hours of May 24, 2003, and accompanied Sgt. Waguespack to the shoulder of the I–10 expressway. Officer Sam testified that he noted the placement and condition of the victim's body and then proceeded to direct the flow of the traffic through the area. While Sgt. Waguespack spoke with the defendant, Officer Sam testified that he overheard part of their conversation, including the defendant's mention of a black male. When Officer Sam arrived on the scene, the defendant appeared agitated, and during the conversation with Sgt. Waguespack, the defendant became belligerent and shoved Sgt. Waguespack. Officer Sam intervened, and the defendant pushed him also. After the officers subdued the defendant, Officer Sam issued a citation to the defendant, charging him with battery of the officers and public intoxication, and placed the defendant in the police vehicle to transport him to Central Lockup, where he confiscated the defendant's clothing.

Officer Sam testified that the defendant's socks, blue jeans, and underwear were placed in a clear plastic bag, and that he was in close proximity when Detective Andre Giles transferred the clothing to Central Evidence and Property (CEP) and filled out the evidence tags and logged the clothing into CEP. Officer Sam identified the evidence receipt and identified

---

[8]Ms. Annie Lockett, a supervisor of the NOPD 911 Communications Center, explained to the jury the procedure for processing 911 calls. When a call comes in, information is obtained from the caller, entered into the computer system and given an Incident Recall number. All calls are recorded and stored so that they can be retrieved at any time. Ms. Lockett identified the transcription of the 911 call received in this case at 12:42 a.m. on May 24, 2003. The audio of the call was played for the jury.

the item number on the receipt as the same one associated with this case, and also identified photographs of the jean shorts, t-shirt, and underwear as depicting the same items he witnessed the defendant remove at Central Lockup. Officer Sam further testified that he noticed stains on the front of the defendant's underwear when he saw the defendant remove them on May 24, 2003.

Officer Sam identified copies of CEP evidence receipts under the same item number assigned to Brandy's murder that showed evidence being logged in on both May 24 and May 25, 2003. Officer Sam testified that he was present when Detective Giles logged all of the defendant's clothing into CEP in the same plastic bag on May 24, and that neither he nor Detective Giles returned to CEP on May 25 to submit evidence in the case.[9] Next, Officer Sam identified a blown-up copy of a CEP receipt showing the defendant's white underwear being logged into evidence on May 25, under the same receipt number as the other pieces of clothing. Officer Sam testified that the receipt was incorrect and that the defendant's underwear was not logged in on May 25; rather, the clothing was logged in on May 24, immediately after it was confiscated from the defendant.

Detective Andre Giles, who also responded to the scene that evening, testified at trial. Detective Giles testified that when he arrived at the scene, he was informed by Sgt. Waguespack that Brandy's body had been removed from the scene, and the defendant was handcuffed and sitting in the police vehicle. At that time, the defendant was not a suspect in the homicide. Detective Giles testified that he received all the information Sgt. Waguespack had on the case and learned that the defendant would be interviewed at police headquarters.

At police headquarters, the defendant told Detective Giles that defendant that two suspects picked him and Brandy up on the interstate, and that the two suspects let the defendant out of the car at a certain area and told him they would let his daughter out farther down the road. When Detective Giles tried to clarify information the defendant gave, the defendant asked for an attorney, and the interview ended. Prior to the brief conversation between Detective Giles and the defendant, the defendant requested a cup of water and a cigarette. After the interview ended, Detective Giles confiscated the cup and the cigarette and transported the defendant to Central Lockup where his clothes were confiscated by Detective Michael Sam and given to Detective Giles in a clear plastic bag. Detective Giles testified that at no time did he open the bag, or remove or add clothing to the bag once it was logged in.

Detective Giles identified the evidence receipt he received at Central Evidence indicating that he had logged in blue jean shorts and a pair of white

---

[9]Officer Sam testified that he did not recall seeing a white cup containing six cigarette butts among the evidence logged in by Detective Giles.

socks in one package and one cup containing water and a cigarette butt for DNA testing in a separate bag. Though he was unaware at the time that the defendant's underwear was included in the items confiscated from the defendant, he later learned of its presence from Sgt. Waguespack. The evidence receipt reflected that the items were confiscated at 15:45 on May 24, 2003. Although the receipt also indicated that the items were logged in on May 24, at 5:19 a.m., Detective Giles testified that the time was incorrect, because he did not log in the defendant's underwear on May 24. Although the underwear was in the bag of clothing confiscated from the defendant on May 24, it was not logged in until May 25.

Detective Giles explained the discrepancy as simply human error on his part, and testified that he became aware of the error when Sgt. Waguespack advised him the defendant's underwear was in the bag with the blue jean shorts and the pair of socks.[10] Accordingly, Detective Giles returned to Central Evidence on May 25 and filled out another evidence tag which correctly reflected the contents of the bag, including the underwear. Detective Giles further explained that the reason the underwear was not initially listed on the evidence tag is because he could not see them in the bag because it was rolled up within the blue jean shorts when the clothing was provided to CEP.

Lieutenant Brian Monteverde, the Assistant Commander of the evidence room, also testified at trial. Lt. Monteverde explained that he was working in the evidence room as a sergeant in 2003 and confirmed that CEP was located in the basement of Central Lockup at that time and was completely inundated by water when Hurricane Katrina struck the city, destroying all items in CEP. As a result, no evidence relative to this case survived.

Lt. Monteverde explained the procedure for submitting and logging in evidence and the difference between the two. When evidence is delivered to CEP by a detective or an officer on duty, the detective or officer fills out a tag for each item indicating his name and badge number and noting date, time and location where the item(s) was/were received and a description of the item(s). The information is entered into the computer which lists the information submitted, and the computer automatically enters the correct date and time, regardless of the date and time the officer may have listed on the tag. The date and time generated by the computer cannot be altered. The detective or officer then inspects the information listed on the tag and acknowledges its correctness by placing his initials next to his signature and maintains a receipt verifying the items have been placed in the evidence room. If a package is delivered to CEP by a detective or officer containing five items, but the card that is submitted with the bag only contains three items,

---

[10]He denied ever removing any of the clothing from the bag and denied placing stains on the defendant's underwear.

the receipt will reflect only the three items listed by the detective/officer, not five. If the detective or officer comes back at another time to document the two items which were not initially documented, the receipt reflecting the two items would not bear the same receipt number as the original receipt; the computer generates a new receipt number.

In addition, the first receipt receives a bar code number from the receiving clerk, and the second receipt would receive a different bar code number. Bar code numbers are assigned in sequential order. If an item pertinent to one case is logged in on one day and an item relative to that same case is logged in on the following day, there will be a skip in sequential order caused by evidence logged in the intervening time frame. Lt. Monteverde confirmed that the CEP staff is supposed to verify the contents of evidence bags it receives, if the evidence cannot all be seen as submitted. He also testified that NOPD policy mandated that all evidence be logged in prior to the end of an officer's shift in order to maintain its integrity.

Joseph Tafaro, a currently retired NOPD criminalist and serologist, testified at trial. Mr. Tafaro explained to the jury that serology is the study of bodily fluids, such as blood, seminal fluid, and saliva. He tested various items of clothing associated with this case and prepared a written report of his findings. Mr. Tafaro's testing on the defendant's t-shirt proved positive for blood and the defendant's underwear tested positive for both blood and seminal fluid. Visual laboratory analysis of the defendant's denim shorts failed to reveal the presence of blood or seminal fluid. Likewise, testing done on the defendant's tennis shoes did not reveal the presence of blood. Mr. Tafaro also tested the victim's underwear, bra and t-shirt, all of which proved positive for blood.

Ms. Anne Montgomery testified that in 2003, she was employed by the city as a DNA Technical Leader, as well as working in Jefferson Parish as its forensic DNA lab director,[11] and in her professional lifetime, she has performed thousands of DNA tests and has testified as an expert witness for both the State and the defense. Ms. Montgomery explained to the jury that DNA is a molecule found within virtually every cell of the human body. She testified that she compared a sample of DNA belonging to Brandy Ferguson against an unknown blood sample.[12] Ms. Montgomery identified the report that she issued in connection with Brandy's case, which indicated that the samples received by the DNA lab corresponded to the barcodes associated with those items at CEP.

---

[11]Defense counsel stipulated as to Ms. Montgomery's expertise in molecular biology and DNA forensic analysis.

[12]Ms. Montgomery testified that the analysis was performed at the NOPD crime lab, which had been certified as compliant with the FBI's quality assurance standards.

Ms. Montgomery received six items of evidence, the first of which was Brandy's DNA card, which contained preserved samples of the genetic material to be analyzed. Other items included two vials of blood from the defendant, a vial of his saliva, and a cutout from his underwear and t-shirt. Ms. Montgomery's analysis indicated that the blood on both the defendant's underwear and t-shirt was from Brandy Ferguson, and that her genetic profile occurred in a frequency of one in ten billion people, which was a conservative estimate.[13] The defendant was absolutely excluded as the donor. Ms. Montgomery confirmed that the items to be tested were received in the DNA lab by analyst Debra Lynn Wesley on June 17, 2003, at 11:15 a.m. The items were stored in a freezer until tested and returned to CEP on July 9, 2003. Ms. Montgomery confirmed this through both the NOPD and DNA lab's internal chain of custody documentation. She also confirmed that only a small portion of each item was sampled in order to leave evidence for further retesting.

On cross-examination, Ms. Montgomery acknowledged that, as supervisor, she did not actually perform the testing on the defendant's underwear and t-shirt, but was responsible for reviewing test results. She reiterated that all her analysts met the FBI's quality assurance standards. She also said that the criminalist who actually performed the analysis on the items in question was Debra Lynn Wesley, who was no longer with the crime lab. Ms. Montgomery stated that she would not know if someone had tampered with the evidence before it reached the DNA lab.

Ms. Montgomery testified that the DNA lab has a written standard operating procedure manual or protocol that helps to ensure consistency of the methods used and reliability of the results obtained by the analysts in the lab, and which is required by the FBI. She also explained that analysts are required to have a Bachelor of Science degree and to complete six months of DNA analysis training and pass a competency test in order to perform testing on evidence. Furthermore, attendance at a scientific meeting, such as one by the Louisiana Association of Forensic Scientists, is required as part of continuing education. Each analyst was required to take a proficiency or competency test twice a year. Ms. Montgomery emphasized that she was only qualified to speak to certification requirements in the fields of molecular biology and DNA testing.

Defense witness Dr. Douglas Posey of the Georgia Bureau of Information was qualified as an expert in clinical, forensic and anatomic pathology. Dr. Posey reviewed the autopsy protocol on Brandy Ferguson. He explained that a laceration is blunt trauma as opposed to sharp force trauma and is a crushing injury. According to Dr. Posey, by definition, a laceration does not bleed; hence "superficial vaginal lacerations with vaginal bleeding"

---

[13]Although the frequency calculation is first transcribed as one in ten million, it is thereafter consistently quoted as one in ten billion.

as noted in Dr. Alvaro Hunt's autopsy protocol was not possible. Dr. Posey further indicated that it is possible to determine when a laceration occurred by changes noted in the nature of the laceration. Dr. Posey testified that a laceration begins to heal three days after the trauma; a proliferation phase occurs from three to ten days; and the remodeling phase begins up to fourteen days post-trauma. Dr. Posey further noted that Dr. Hunt's report did not indicate testing to determine the age of lacerations found on Brandy's body.

Dr. Posey testified that the type of lacerations on Brandy's body could occur during consensual sex, and that nothing in Dr. Hunt's report would allow him to conclude that Brandy was raped as opposed to having had engaged in consensual intercourse. Nor, in his opinion, was there any evidence that Brandy suffered penile penetration. Dr. Posey testified that the broad ligament hemorrhage sustained by Brandy more resembled a contusion or bruise, and that such a bruise required at least twenty-four hours after trauma to form. Dr. Posey further testified that the autopsy protocol did not indicate the number of assailant(s), their gender or race. Dr. Posey agreed that manual strangulation was the cause of death.

Under cross-examination, Dr. Posey admitted that he did not attend the autopsy on Brandy's body and that he was paid by the defense for his trial testimony. He also acknowledged that vaginal lacerations can be caused by a penis during a rape, and that the term "laceration" could be used to describe a cut. Moreover, he testified that all of the types of injuries seen in Brandy's vaginal area could be consistent with a very violent sexual assault. Though he was advised by defense counsel that Brandy was at the end of her menstrual cycle at the time of her death, he was not qualified to independently confirm that fact because he received that information from Brandy's family. Finally, Dr. Posey testified that the types of injuries seen on Brandy's body could have been caused by her struggle while being strangled, and that it was possible that the assailant would not have had any visible injuries.

Dr. Alvaro Hunt was recalled by the State and testified, contrary to Dr. Posey's assertion, that a laceration is, in fact, a tear in the skin caused by a knife, razor, glass or other similar instrument, and that the small blood vessels in the vicinity of the tear begin to bleed. Thus, Brandy Ferguson suffered two lacerations in the vaginal vault. Dr. Hunt testified that, based upon his inspection of Brandy's uterus, which did not contain any blood, he concluded that the blood found on Brandy's legs and within her vaginal canal were from lacerations, not her menstrual cycle. Furthermore, the endometrial lining of the uterus was flat, firm and round as opposed to prior to menstruation, when the lining of the uterus is thick and smooth. Dr. Hunt further stated that the blood present on Brandy's legs resulted from the injury to the broad ligament, and that injury occurred less than twenty-four hours prior to death.

On April 18, 2009, the jury found Ferguson guilty as charged.[14]  After the sentencing phase of the trial, the jury recommended that Ferguson be sentenced to imprisonment for life, rather than receiving the death penalty.[15]  On May 20, 2009, Ferguson was sentenced accordingly to life imprisonment without the benefit of probation, parole, or suspension of sentence.[16]

On direct appeal, Ferguson asserted two errors: (1) the trial court erred in qualifying Joseph Tafaro as an expert in serology, and Ferguson's right to confrontation and fair trial was denied by the trial court's refusal to allow a full cross-examination on Tafaro's lack of credentials; and (2) the trial judge erred in admitting into evidence the serology analyses of the sample taken from Ferguson's underwear where (a) the evidence was unable to be independently tested by the defense and (b) the chain of custody and analysis was suspect, which deprived Ferguson of his constitutional right to present a defense.[17]  On December 15, 2010, the Louisiana Fourth Circuit Court of Appeal affirmed his conviction

---

[14]State Rec., Vol. 1 of 39, Minute Entry, 4/18/09; State Rec., Vol. 33 of 39, Trial Transcript, 4/18/09.

[15]State Rec., Vol. 1 of 39, Minute Entry, 4/20/09; State Rec., Vol. 35 of 39, Trial Transcript, 4/20/09.

[16]State Rec., Vol. 1 of 39, Minute Entry, 5/20/09; State Rec., Vol. 35 of 39, Sentencing Transcript, 5/20/09.

[17]State Rec., Vol. 3 of 39, Appellant's Brief, 2009-KA-1422, 4/1/10.

and sentence.[18]  The Louisiana Supreme Court denied the related application for writ of certiorari, without stated reasons, on June 3, 2011.[19]

On July 11, 2012, Ferguson submitted an application for post-conviction relief to the state district court.[20]  In his application, he asserted six claims for relief: (1) he was denied his right to confront the State's DNA analyst; (2) he was denied his constitutional right to testify in his own defense; (3) ineffective assistance of trial counsel; (4) ineffective assistance of appellate counsel; (5) insufficient evidence to support his conviction; and (6) the cumulative effect of the alleged errors rendered his trial fundamentally unfair.[21]

The state district court denied relief on August 22, 2013.[22]  In its judgment, the district court found the first four claims meritless and failed to consider claims (5) and (6) because the court found that they were not within the enumerated cognizable claims one can assert in an application for state post-conviction relief.[23]  The Louisiana Fourth Circuit Court of Appeal denied Ferguson's related supervisory writ application, finding no error in

---

[18]*State v. Ferguson*, 54 So. 3d 152 (La. Ct. App. 2010); State Rec., Vol. 3 of 39, 4th Cir. Opinion, 2009-KA-1422, 12/15/10.

[19]*State v. Ferguson*, 63 So. 3d 1008 (La. 2011); State Rec., Vol. 38 of 39, La. S. Ct. Order, 2011-KO-0135, 6/3/11.

[20]State Rec., Vol. 39 of 39, Application for Post Conviction Relief, 7/11/12.

[21]*Id.*

[22]State Rec., Vol. 39 of 39, District Ct. Judgment, 8/22/13.

[23]*Id.*

the district court's ruling.[24]  The Louisiana Supreme Court subsequently denied the related

writ, without stated reasons, on July 31, 2014.[25]

## II.    *Federal Habeas Petition*

On August 7, 2014, Ferguson filed a federal petition for *habeas corpus* relief in this

court.[26]  In the instant petition, he asserts the following grounds for relief: (1) trial court

erred in qualifying Joseph Tafaro as an expert in serology; (2) he was denied the right to

independently test the clothes seized from him due to the State's incompetence, thereby

prejudicing his ability to present a defense; (3) the State failed to establish the chain of

custody regarding the clothes subject to DNA testing, rendering them inadmissible at trial;

(4) he was denied the right to confront the State's forensic witness; (5) he was denied his

right to testify in his own defense; (6) he received ineffective assistance of trial counsel; (7)

he received ineffective assistance of appellate counsel; (8) trial evidence was legally

insufficient to support his conviction; and (9) the cumulative effect of all the above errors

rendered his trial fundamentally unfair.[27]

---

[24]State Rec., Vol. 39 of 39, 4th Cir. Order, 2013-K-1385, 10/16/13.

[25]State Rec., Vol. 39 of 39, La. S. Ct. Order, 2013-KH-2669, 7/31/14.

[26]Rec. Doc. No. 4, Petition.

[27]*Id.*  Ferguson groups claims (2) and (3) together in his petition, which therefore reflects eight grounds for relief.  These claims have been separated to ease disposition.

18

### III.    *General Standards of Review*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104132, 110 Stat. 1214,[28] applies to this petition, which is deemed filed in this Court no later than August 7, 2014.[29]   The threshold questions on *habeas* review under the amended statute are whether the petition is timely and whether the claim raised by the petitioner was adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  *Nobles v. Johnson*, 127 F.3d 409, 419–20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)). The State asserts that one issue raised by Ferguson is in procedural default, having been dismissed by the state courts as procedurally barred from review.   That issue is Ferguson's claim that the cumulative effect of the other asserted errors rendered his trial fundamentally unfair.

Regarding procedural bars, the United States Fifth Circuit Court of Appeals has held:

A claim that a state has withheld a federal right from a person in its custody may not be reviewed by a federal court if the last state court to consider that

---

[28]The AEDPA comprehensively revised federal *habeas corpus* legislation, including 28 U.S.C. § 2254, and applied to *habeas* petitions filed after its effective date, April 24, 1996. *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)).  The AEDPA, signed into law on that date, does not specify an effective date for its non-capital *habeas corpus* amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  *United States v. Sherrod*, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992).

[29]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including *habeas* corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se.  Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes.  *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999); *Spotville v. Cain*, 149 F.3d 374, 376–78 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995). The clerk of court filed Ferguson's federal habeas petition on August 26, 2014. Ferguson signed the petition on August 7, 2014, which is the earliest date upon which he could have delivered the petition to prison authorities for mailing.

claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision. To satisfy the "independent" and "adequate" requirements, the dismissal must "clearly and expressly" indicate that it rests on state grounds which bar relief, and the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims. This rule applies to state court judgments on both substantive and procedural grounds.

*Finley v. Johnson*, 243 F.3d 215, 218 (5th Cir. 2001) (citations omitted).

Here, it is clear from the record that this claim was denied on procedural grounds.[30] The state district court denied Ferguson's claim regarding the cumulative effect of the errors which he alleges denied him a fundamentally fair trial, simply stating that this claim did not fall within the enumerated list of grounds which a defendant can raise in an application for post-conviction relief under Louisiana Code of Criminal Procedure article 930.3.[31]

The procedural rule invoked with respect to this claim is obviously independent of the merits of the federal claim.  Thus, the court needs only to determine whether those rules were "adequate."

"The [procedural bar] doctrine presumes that a state procedural ground is adequate ... and, ordinarily, the burden is on the habeas petitioner to demonstrate otherwise." *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999). In order to establish that a state procedural rule is not "adequate," a petitioner bears the burden of showing that the state

---

[30]The court notes that Ferguson's claim challenging the sufficiency of the evidence was also denied by the state district court on procedural grounds.  However, as the State correctly concedes, that procedural rule was not an adequate and independent state law ground. Thus, that claim is considered on the merits below.

[31]State Rec., Vol. 39 of 39, District Ct. Judgment, 8/22/13.

did not strictly or regularly follow the procedural rule. *Stokes v. Anderson*, 123 F.3d 858, 860 (5th Cir. 1997). Here, Ferguson has made no attempt whatsoever to establish that the rule was not strictly or regularly followed.

In fact, it appears that this rule was regularly followed in Louisiana state courts. *See, e.g., State v. Kelly*, 153 So.3d 1257, 1266 (La. App. 3 Cir. 2014); *State v. Rochon*, 733 So. 2d 624, 633 (La. App. 5 Cir. 1999); *State v. Manning*, 885 So. 2d 1044, 1110 (La. 2004). Thus, this court finds that the procedural rule in question is an independent and adequate state court ground. "When the state court has relied on an independent and adequate state procedural rule, federal habeas review is barred unless the petitioner demonstrates either cause and prejudice or that a failure to address the claim will result in a fundamental miscarriage of justice." *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999). Here, Ferguson has demonstrated neither.

To establish cause for a procedural default, there must be something *external* to the petitioner, something that cannot fairly be attributed to him." *Johnson v. Puckett*, 176 F.3d 809, 816 (5th Cir. 1999) (quotation marks omitted) (emphasis in original). Ferguson has made no effort in this federal proceeding to establish cause for his procedural default. Because he has not shown cause, "it is not necessary for the court to consider whether there is actual prejudice." *Martin v. Maxey*, 98 F.3d 844, 849 (5th Cir. 1996). Because petitioner has not met the "cause and prejudice" test, this court must determine whether the application of the procedural bar would result in a fundamental miscarriage of justice. In order to establish that there be a "fundamental miscarriage of justice," a petitioner must "make a persuasive showing that he is actually innocent of the charges against him.

Essentially, the petitioner must show that, as a factual matter, he did not commit the crime for which he was convicted." *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001) (citations omitted). The United States Fifth Circuit Court of Appeals has held:

> To demonstrate actual innocence, it is necessary that the petitioner show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt ... in light of all of the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongfully excluded or to have become available only after trial.

*Lucas v. Johnson*, 132 F.3d 1069, 1077 (5th Cir. 1998) (quotation marks and citations omitted). Applying that standard, the Court finds that Ferguson does not make a persuasive showing that he is actually innocent of the charges against him. Therefore, he has not demonstrated that any miscarriage of justice will result from the application of the procedural bar. The Court now turns to review the merits of Ferguson's remaining claims below.

## IV.    *Standards of a Merits Review*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both. The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

A state court's determination of factual issues is presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.   The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

A state court's determination of questions of law and mixed questions of law and fact is given deference under 28 U.S.C. § 2254(d)(1), unless the decision "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States, or ... involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000).   The "contrary to" and "unreasonable application" clauses have distinct meaning:

> A decision is contrary to clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."   Under § 2254(d)(1)'s "unreasonable application" language, a writ may issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."

*Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001) *(quoting Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)) (citations omitted).   However, "'[a] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court decision applied [a Supreme Court case] incorrectly.'"  *Price v. Vincent*, 538 U.S. 634, 641 (2003) (*quoting Woodford v. Visciotti*, 537

U.S. 19, 24–25 (2002)) (brackets in original); *Bell v. Cone*, 535 U.S. at 699 (2002). Rather, under the "unreasonable application" standard, "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002), *cert. denied, sub nom, Neal v. Epps*, 537 U.S. 1104 (2003).

The burden is on the petitioner to show that the state court applied the precedent to the facts of the case in an objectively unreasonable manner. *Price*, 538 U.S. at 641 (*quoting Woodford*, 537 U.S. at 24–25); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 786–787, 178 L.Ed.2d 624 (2011)).

## V.   *Petitioner's Claims*

### 1.   Trial court erred in qualifying Joseph Tafaro as an expert in serology

In his first claim, Ferguson contends that the state trial court erred in qualifying Joseph Tafaro as an expert in serology, and that his right to confrontation was violated in regards to cross-examining Tafaro because Tafaro could no longer recall the details of his analysis in the case, thus effectively rendering him "unavailable" as a witness.

As to Ferguson's claim that the state trial court should not have qualified Tafaro as an expert in serology, this claim must fail. To the extent that Ferguson argues that the

qualification of Tafaro was a violation of Louisiana law, that claim is not cognizable on federal *habeas* review.  *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (federal *habeas* corpus relief does not lie for errors of state law).  Instead, *habeas corpus* review is limited to questions of constitutional dimension, and federal courts generally do not review the admissibility of evidence under state law.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Gonzales v. Thaler*, 643 F.3d 425, 429 (5th Cir. 2011); *Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992).

Thus, federal courts do not sit to review the propriety of state-court evidentiary rulings, unless the ruling violates due process in such a way that the violation renders the criminal proceeding fundamentally unfair.  *Lisenba v. People of the State of California*, 214 U.S. 219, 236-37 (1941).  Federal *habeas* review on such matters is proper only to determine whether a state trial judge's error is so extreme as to render the trial fundamentally unfair or violate an explicit constitutional right.  *Peters v. Whitley*, 942 F.2d 937, 940 (5th Cir. 1991).  In keeping with this principle, the United States Court of Appeals for the Fifth Circuit has stated that the admission of prejudicial evidence is fundamentally unfair so as to justify federal *habeas corpus* relief only if it "played a crucial, critical, and highly significant role in the trial." *Gonzales*, 643 F.3d at 430 (quotation omitted).

This issue presents a mixed question of law and fact. *Wilkerson v. Cain*, 233 F.3d 886, 890 (5th Cir. 2000). Under the applicable standard of review, this court therefore must determine if the state court's decision is contrary to or involved an unreasonable application of Supreme Court precedent.  Under these rigorous standards, Ferguson has

failed to meet his burden regarding the trial court's qualification of Tafaro and admission of his testimony.

Ferguson alleges in his petition that the trial court's qualification of Tafaro violated Louisiana Code of Evidence article 701 and was in violation of Louisiana Supreme Court precedent. These challenges allege state evidentiary errors and, as such, are not cognizable grounds for federal *habeas* relief. Furthermore, despite alleging that the expert testimony was "more than harmful," Ferguson has failed to demonstrate that Tafaro's expert testimony rendered his trial fundamentally unfair.

Turning to the rest of this claim, Ferguson alleges that he was denied his Sixth Amendment right to confront a witness. The Sixth Amendment provides, in relevant part, "In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him." A violation of this right is a cognizable claim for *habeas* relief. In *Crawford v. Washington*, the United States Supreme Court held that  a defendant's confrontation right is violated by the introduction at trial of an absent witness' out of court statement if the defendant did not have a prior opportunity to cross-examine the witness under oath. 541 U.S. 36, 53-54 (2004). In *Melendez-Diaz v. Massachusetts*, the United States Supreme Court extended *Crawford* to prohibit the prosecution's use of certificates of analysis to prove the nature of physical evidence in lieu of live testimony from the criminalist who actually performed the scientific testing. 557 U.S. 305, 311 (2009).

Here, although Tafaro–who prepared the serology report and performed the testing–testified at trial, Ferguson argues that his inability to independently recall the test and the photographs he apparently signed, made him effectively unavailable for cross-

26

examination.  This part of Ferguson's claim must also fail, as Tafaro was indeed present and available for cross-examination.  Ferguson points to no Supreme Court precedent, and this Court can find none, to extend *Melendez-Diaz* to state that a defendant's confrontation rights are violated in situations where the analyst is present at trial yet cannot "independently recall" the specifics of the case without relying on his own report. Ferguson has not shown that the state courts' denial of this claim was contrary to or an unreasonable application of federal law, and therefore he is not entitled to federal *habeas corpus* relief on this claim.

### 2. Right to present a defense violated by the State's loss of physical evidence

In part of his second claim, Ferguson asserts that his right to present a defense was violated due to the State's incompetence, which caused a loss in the physical evidence prior to trial, meaning it was unavailable for independent testing by Ferguson.  He argues that under Louisiana Code of Criminal Procedure article 718, he was entitled to independent testing of the evidence, and because he never received the opportunity to test it before it was destroyed, the evidence should have been excluded at trial.

First, the Court notes that again this question involves an application of state evidentiary law, which does not constitute a cognizable claim on *federal habeas* corpus review unless the state court's error was so extreme that it renders the trial fundamentally unfair.  *Lisenba v. People of the State of California*, 214 U.S. 219, 236-37 (1941); *Peters v. Whitley*, 942 F.2d 937, 940 (5th Cir. 1991).  Here, such a showing has simply not been made by Ferguson, especially in light of the fact that he has failed to establish any underlying state-court error.

27

As the Louisiana Fourth Circuit Court of Appeal noted in its decision on direct appeal–the last reasoned state-court decision on this matter–contrary to Ferguson's assertion that the evidence was lost due to the State's "incompetence," it was actually destroyed in Hurricane Katrina.[32]  Furthermore, the record shows that Ferguson had two years from his indictment until Hurricane Katrina struck within which he could have had the evidence independently tested.  There is no indication in the record that he made a request to do so, and thus he cannot argue now on *habeas* review that he was prejudiced for his inability to independently test the evidence.

Insofar as the "right to present a defense" is a cognizable claim on *habeas*, Ferguson has also not shown that the admission of the State's evidence is a basis for this claim.  As noted by the State, the right to present a defense, while acknowledged in Supreme Court precedent, does not equate to a right to exclude the State's evidence, but rather stands as the (somewhat limited) right of a defendant to admit relevant evidence.  *See, e.g. Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013) (discussing the rare instances when the right to present a defense was violated "by the exclusion of defense evidence under a state rule of evidence" but not mentioning any instance where it was violated by admission of evidence)*; Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986) ("[The opportunity to be heard] would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case

---

[32]*See State v. Ferguson*, 54 So. 3d 152, 170 (La. App. 4 Cir. 2011).

encounter and survive the crucible of meaningful adversarial testing.") (internal quotations omitted).

Thus, despite asserting a potentially cognizable claim, Ferguson has failed to show that the admission of this evidence by the State, despite his inability to test that evidence independently, was contrary to or an unreasonable application of clearly established Supreme Court precedent.  Thus, he is not entitled to federal *habeas corpus* relief on this claim.

**3. The State failed to establish the chain of custody regarding the clothes that were subject to DNA testing, rendering the DNA evidence inadmissible at trial**

In the next part of Ferguson's claim, he asserts that the DNA evidence from his clothing was improperly admitted because the chain of custody as to the clothing was suspect.  Ferguson has not substantiated his claim concerning problems with the chain of custody.  In any event, "questions relating to the admissibility of evidence are matters of State law and generally do not give rise to constitutional errors which are subject to redress in Federal habeas corpus cases."  *Taylor v. Maggio*, 581 F. Supp. 359, 365-66 (E.D. La. 1984).  Thus, defects in the chain of custody alone do not rise to a constitutional deprivation.  *Id.*; *Gordon v. Cain*, No. 04-1058 (E.D. La. Nov. 29, 2006), 2006 WL 3469564, at *2 (same).  Thus, unless Ferguson can show that an erroneous evidentiary ruling caused a denial of fundamental fairness, federal *habeas corpus* relief is not warranted.

Ferguson only asserts this claim vaguely in a headnote, and does not clearly explain the basis for the claim within his memorandum.  He does later state that "the acknowledged chain of ineptitude by three trained detectives with years of experience -

29

from the alleged seizure of Barry Ferguson's clothing to the packing of it, to the unpacking

and repacking of it, to the alteration of the paperwork without an explanatory report - flies

in the face of believability."

However, this statement does not support a finding of fundamental unfairness necessary

for *habeas* relief.

In fact, under Louisiana law, chain of custody is a factual matter to be determined by

the jury. *State v. Sam*, 412 So.2d 1082, 1086 (La. 1982).  This Court's thorough review of

the record indicates that there was an issue at trial regarding when the evidence was

logged in to Central Evidence and Property.  According to the transcript, originally all of

Ferguson's clothes were logged into evidence in a single bag, with the receipt not indicating

that the underwear was in the bag–only that the jeans, socks and t-shirt were.  After a

detective realized this error, he returned to Central Evidence and Property to correct the

tag, which created a new receipt with a different time stamp.  Defense counsel cross-

examined both detectives regarding the chain of custody, placing it in issue before the jury.

Indeed, the record shows the foundation laid by the testimony of the detectives, which

makes it more probable than not that the evidence admitted at trial was the same evidence

that was collected upon Ferguson's arrest.  Ferguson has not met his burden of proving

either the underlying error or the resulting fundamental unfairness necessary for federal

*habeas corpus* relief.  He is therefore not entitled to relief on this claim.

### 4. Denial of the right to confront the DNA analyst who performed the analysis

In his next claim, Ferguson asserts that his Sixth Amendment right to confrontation

was violated when the State did not call Debra Lynn Wesley, the DNA analyst who

performed the DNA testing on the blood and clothing evidence, as a witness at trial.  It is well settled that the Confrontation Clause prohibits admission of "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination."  *Crawford v. Washington*, 541 U.S. 36, 53-53 (2004).  In *Melendez-Diaz v. Massachusetts*, the United States Supreme Court further held that an expert's report is "functionally identical" to a testimonial statement under *Crawford*.  557 U.S. 305, 310-11 (2009).  Therefore, on its face, Ferguson's claim is a cognizable claim for *habeas corpus* relief.

However, in *Melendez-Diaz*, the Supreme Court recognized that a defendant who is placed on notice of the prosecutor's intent to use a forensic report is also on notice that he must exercise his right of confrontation in order to protect that right.  Specifically, the court stated:

> The defendant always has the burden of raising his Confrontation Clause objection; notice-and-demand statutes simply govern the time within which he must do so. States are free to adopt procedural rules governing objections. *See Wainwright v. Sykes*, 433 U.S. 72, 86–87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). It is common to require a defendant to exercise his rights under the Compulsory Process Clause in advance of trial, announcing his intent to present certain witnesses. *See* Fed. Rules Crim. Proc. 12.1(a), (e), 16(b)(1)(C).... There is no conceivable reason why he cannot similarly be compelled to exercise his Confrontation Clause rights before trial. *See Hinojos–Mendoza v. People*, 169 P.3d 662, 670 (Colo. 2007) (discussing and approving Colorado's notice-and-demand provision).

*Melendez-Diaz*, 557 U.S. at 327.  The Supreme Court has therefore approved the use of notice-and-demand statutes as sufficient protection of a defendant's confrontation rights, so long as they "permit the defendant to assert (or forfeit by silence) his Confrontation

Clause right after receiving notice of the prosecution's intent to use a forensic analyst's report." *Melendez-Diaz*, 557 U.S. at 326.

Here, it is clear from the record that the state district court rejected Ferguson's claim because he failed to comply with Louisiana's notice and demand statute pursuant to La. R.S. §§ 15:499-501.[33]  Under Louisiana law, if the prosecution complies with the notice-and-demand provisions, by filing a notice of intent to use the report, within the statutorily mandated time, the laboratory certificate and report are admissible *prima facie* proof, unless the defendant makes timely written demand for the analyst to testify.  If the defendant fails to do so, he waives his Sixth Amendment rights under the Confrontation clause.  *State v. Simmons*, So. 3d 732 (La. 2012) (citing *Melendez-Diaz*).

As the state district court correctly noted in its opinion, and this Court's review of the record confirms, Ferguson has not alleged that the State failed to provide notice under the statute, nor has he established that he properly demanded that the DNA analyst who performed the test be available for cross-examination.  In fact, in his federal petition Ferguson states that "[t]he defendant's ability to subpoena analysts does not obviate the State's obligation to produce analysts for cross-examination."  This is incorrect.  *See Ducre v. Cain*, No. CIV.A. 12-2506, 2013 WL 8633253, at *30 (E.D. La. Oct. 21, 2013) *report and recommendation adopted*, No. CIV.A. 12-2506, 2014 WL 2719172 (E.D. La. June 16, 2014) (rejecting a similar claim of a confrontation clause violation where the defendant failed to comply with Louisiana's notice-and-demand statute).  Thus, Ferguson has failed to establish a violation of his Sixth Amendment rights.  He waived any such rights to

---

[33]State Rec., Vol. 39 of 39, District Ct. Judgment, 8/22/13.

confrontation when he failed to demand the presence of the preparer.  This scenario has been recognized by the United States Supreme Court in *Melendez-Diaz* as an acceptable procedure for protecting a defendant's Sixth Amendment confrontation rights.

Thus, the state courts' denial of relief on this claim was neither contrary to, nor an unreasonable application of, Supreme Court precedent.  Ferguson is not entitled to federal *habeas corpus* relief on this claim.

### 5. Denial of his right to testify

Ferguson asserts that he was denied his constitutional right to testify in his own defense at trial, in violation of the Fifth, Sixth and Fourteenth Amendments, by defense counsel's decision alone.  According to his allegations, Ferguson and his trial counsel discussed that he would "need to testify because the jury would want to hear his side." However, Ferguson was not called to testify at trial.[34]

In the last reasoned state-court decision on this issue, the state district court rejected this claim, finding that "Mr. Ferguson fails to specify with reasonable particularity the factual basis to support his claim that trial counsel interfered with his Fifth, Sixth and Fourteenth Amendment rights."[35]  This Court's review of the record in light of Ferguson's allegations leads to the same conclusion.  Ferguson has not set forth this claim with particularity; he asserts bare allegations that his trial counsel later changed their mind and told him they were "not going to put him on the stand."  A review of the state court record shows that at no time did Ferguson indicate to the trial court his desire to testify.  The

---

[34]State Rec., Vol. 33 of 39; Trial Transcript, 4/18/09.  Defense counsel rested its case without Ferguson ever appearing in the transcripts.

[35]State Rec., Vol. 39 of 39, District Ct. Judgment, 8/22/13.

United States Court of Appeal for the Fifth Circuit has stated: "In the absence of evidence in the state court record of the defendant's wish to testify, we think it appropriate for the habeas court to presume that the defendant acquiesced in his counsel's advice or otherwise made a voluntary choice not to testify. " *Jordan v. Hargett*, 34 F.3d 310, 315 (5th Cir. 1994) on *reh'g en banc*, 53 F.3d 94 (5th Cir. 1995).

Because Ferguson has not shown any evidence that he did not voluntarily waive his right to testify, he fails to rebut the presumption that he did.  Thus, the state courts' rejection of this claim was not an unreasonable application of, nor contrary to, federal law. Ferguson is not entitled to *habeas corpus* relief on this claim.

### 6.  Ineffective assistance of trial and appellate counsel

In his next two claims, Ferguson asserts that he received ineffective assistance of both trial and appellate counsel. These claims are addressed together herein, as the same federal standard applies.  Specifically, Ferguson asserts that he received ineffective assistance of trial counsel for three reasons: (1) failure to conduct any pre-trial investigation, including testing DNA evidence that he asserts was crucial to proving his innocence; (2) failure to allow petitioner to testify in his own defense; and (3) failure to hire a forensic expert for the defense.  Ferguson asserts he received ineffective assistance of appellate counsel for failure to raise two claims on appeal: (1) insufficiency of the evidence and (2) denial of the right to confrontation, which thereby abandoned those claims for review.

The United States Supreme Court has established a two-pronged test for evaluating claims of ineffective assistance of counsel.  Specifically, a petitioner seeking relief must

demonstrate both that counsel's performance was constitutionally deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 697 (1984). A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1993); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, *i.e.* deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. *Strickland*, 466 U.S. at 697.

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *See Strickland*, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690). A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986); *Matthesen v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

To prevail on the prejudice prong of the *Strickland test*, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different." *Strickland*, 466 U.S. at 694. In this context, a

reasonable probability is "a probability sufficient to undermine confidence in the outcome."

*Id.* In making a determination as to whether prejudice occurred, courts must review the

record to determine "the relative role that the alleged trial errors played in the total

context of [the] trial." *Crockett*, 796 F.2d at 793.

Because the state district court rejected petitioner's ineffective assistance of counsel

claims on the merits and because such claims present a mixed question of law and fact, this

Court must defer to the state-court decision unless it was "contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme

Court of the United States." 28 U.S.C. § 2254(d)(1); *Moore v. Cockrell*, 313 F.3d 880, 881

(5th Cir. 2002). Moreover, the United States Supreme Court has explained that, under the

AEDPA, federal *habeas corpus* review of ineffective assistance of counsel claims is in fact

doubly deferential:

> The pivotal question is whether the state court's application of the *Strickland*
> standard was unreasonable. This is different from asking whether defense
> counsel's performance fell below *Strickland*'s standard. Were that the
> inquiry, the analysis would be no different than if, for example, this Court
> were adjudicating a *Strickland* claim on direct review of a criminal conviction
> in a United States district court. Under AEDPA, though, it is a necessary
> premise that the two questions are different. For purposes of § 2254(d)(1),
> an unreasonable application of federal law is different from an incorrect
> application of federal law. A state court must be granted a deference and
> latitude that are not in operation when the case involves review under the
> *Strickland* standard itself.
>
> A state court's determination that a claim lacks merit precludes federal
> habeas relief so long as fairminded jurists could disagree on the correctness
> of the state court's decision. *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124
> S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained,
> "[E]valuating whether a rule application was unreasonable requires
> considering the rule's specificity. The more general the rule, the more
> leeway courts have in reaching outcomes in case-by-case determinations."

> *Ibid.* "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles v. Mirzayance*, 556 U.S. 111, –––––, 129 S.Ct. 1411, 1413–14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

*Harrington v. Richter*, 131 S.Ct. 770, 785–86 (2011) (citation omitted). The Supreme Court then explained:

> Surmounting *Strickland*'s high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 788 (citations omitted). These highly deferential standards also apply to claims of ineffective assistance of counsel arising out of the plea process. *Hill v. Lockhart*, 474 U.S. 52, 57 (1985).

The court will now consider the individual issues raised by Ferguson under the framework of *Strickland*.

### a. Trial counsel's failure to conduct pretrial investigation

First, Ferguson asserts that his trial counsel failed to conduct pretrial investigation by failing to request independent testing of the clothing he was wearing on the night of his daughter's murder during the two years prior to Hurricane Katrina, but after his indictment.   According to Ferguson, this independent testing was crucial because independent testing would have "proved if the blood found on the underwear was on the outside or inside of the underwear, or whether there was any blood found on the jeans." Such a finding would allegedly undermine the State's theory that the blood on the underwear, which was found to belong to Ferguson's daughter, was transferred by his penis after the alleged rape.  Ferguson contends that independent testing may have proved it was on the outside of the underwear and on his jeans which could be explained by transfer after he picked up his daughter's lifeless body.

Ferguson also asserts, somewhat less clearly,  that trial counsel failed to put before the jury statements Ferguson made to the police regarding his daughter's abduction, which allegedly would have helped his case that someone else committed the crime.

Under *Strickland*, a petitioner "who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial."  *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010) (quotation marks and citation omitted).   "The petitioner must provide factual support demonstrating what exculpatory evidence further investigation would have revealed."  *Miller v. LeBlanc*, No. CIV.A. 12©2806, 2014 WL 1154271, at *9 (E.D. La. Mar. 21, 2014) (citing *Moawad v. Anderson*, 143 D.3d 942, 948 (5th Cir. 1998); *Brown v. Dretke*, 419

38

F.3d 365, 375 (5th Cir. 2005); *Davis v. Cain*, No. 07–6389, 2008 WL 5191912, at *10 (E.D.La.

Dec. 11, 2008)).

Here, it is clear that Ferguson has not met his burden on this claim.  The testing of

the evidence revealed that his daughter's blood was on his underwear.  There was some

dispute as to whether it was on the inside or the outside of the underwear, and whether

there was blood on his jeans.  However, even if independent testing would have found that

there was blood on his jeans, or on the "outside" of his underwear, such evidence would not

have been exculpatory, nor altered the outcome of the trial.  The jury could have inferred

from the presence of his daughter's blood anywhere on Ferguson's underwear that he had

removed his pants at some point during the incident–a fact that would tend to support guilt

rather than innocence.

Furthermore, in denying relief on this claim, the state district court, which issued

the last reasoned decision on this claim, correctly identified *Strickland v. Washington* as the

governing constitutional precedent for claims of ineffective assistance of counsel.[36]   In

applying *Strickland* the state district court concluded that independent testing of the

evidence would not have altered the proceeding, as the expert testimony at trial

established the presence of seminal fluid on his underwear, as well as blood from the

victim, his daughter, on both his underwear and t-shirt.  This decision is neither contrary

to, nor an unreasonable application of, federal law.  Ferguson is not entitled to federal

*habeas corpus* relief on this issue.

---

[36]State Rec., Vol. 39 of 39; District Ct. Judgment, 8/22/13.

### b.  Denial of the right to testify

Ferguson also contends that his trial counsel was ineffective because they denied him the right to testify in his own defense.  As previously explained, this Court has already determined that Ferguson failed to meet his burden to show that he was in fact denied his right to testify.  Thus, Ferguson cannot demonstrate deficient performance as required under *Strickland*.  It was therefore not unreasonable for the state courts to deny relief on the claim of ineffective assistance of counsel.   Ferguson is not entitled to federal *habeas corpus* relief on this claim.

### c.  Failure to hire an expert to challenge the State's expert

Ferguson also contends that his trial counsel was ineffective in failing to hire an expert to challenge the testimony of the serology and DNA experts.  In this claim, however, Ferguson states that, "An expert would have been able to testify that none of the evidence presented by the State proved anything but that *someone* murdered the victim, not *raped* her.  An expert would have put the State's circumstantial case to an adversarial testing."

Ferguson's argument is problematic for many reasons.  First, the testimony of the serology and DNA experts, Joseph Tafaro and Dr. Ann Montgomery, respectively, only established the presence of the victim's blood on his clothing, and the presence of seminal fluid in his underwear.  As discussed above, independent testing to challenge this evidence would not likely have altered the outcome of the proceeding.  Thus, it is unclear what an expert to challenge their testimony would testify to, especially absent the ability to independently test the evidence, which was destroyed as a result of Hurricane Katrina.

Second, defense counsel did indeed hire an expert witness, as the state district court pointed out in the last reasoned decision on the issue.[37]  This expert, Dr. Douglas Posey, did in fact testify extensively regarding the different possible causes of the injuries to the victim's body - and specifically testified that something other than penile penetration could have caused the lacerations.[38]  In other words, Dr. Posey, who testified as to the autopsy report, put the State's case to "adversarial testing," by suggesting a cause for the victim's injuries that did not involve rape.  Despite this testimony, as the state district court noted, "the jury nevertheless returned a verdict of guilty."[39]

Thus, not only does Ferguson's claim lack merit because trial counsel actually procured an expert to challenge the very evidence he argues went uncontested, it further lacks merit because he cannot illustrate prejudice, as there is no indication that challenging the serology and DNA experts would have altered the outcome of the proceeding.  In fact, without the availability of independent testing, it is unclear what a separate expert would have based his or her testimony on.  The state courts' denial of this claim was not contrary to, nor an unreasonable application of, federal law and Ferguson is not entitled to federal *habeas corpus* relief on this claim.

---

[37]State Rec., Vol. 39 of 39; District Ct. Judgment, 8/22/13.

[38]State Rec., Vol. 31 of 39, Trial Transcript, 4/16/09.

[39]State Rec., Vol. 39 of 39; District Ct. Judgment, 8/22/13.

**d.  Appellate counsel's failure to raise insufficient evidence and confrontation clause claims**

In his next claim, Ferguson asserts that he was denied effective assistance of appellate counsel because appellate counsel failed to raise two claims on direct appeal (1) insufficient evidence; and (2) violation of the right to confrontation of the DNA analyst. This claim is a cognizable claim for *habeas* relief, as persons convicted of a crime are entitled to effective assistance of counsel in their first appeal of right.  *Evitts v. Lucey*, 469 U.S. 387, 394 (1985).  The *Strickland* standard laid out above also applies to claims regarding appellate counsel.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  To prevail on a claim of ineffective assistance of appellate counsel, a petitioner must show that his appellate counsel unreasonably failed to discover and assert a nonfrivolous issue and establish a reasonable probability that he would have prevailed on this issue on appeal but for his counsel's ineffective performance.  *Briseno v. Cockrell*, 274 F. 3d 204, 207 (5th Cir. 2001).

Effective appellate counsel are not required to assert every nonfrivolous available ground for appeal.  *Green v. Johnson*, 160 F.3d 1029, 1043 (5th Cir. 1998) (citing *Evitts*, 469 U.S. at 394).  In fact, the United States Supreme Court has long recognized that appellate counsel filing a merits brief need not and should not argue every nonfrivolous claim; instead, appellate counsel may legitimately select from among them in the exercise of professional judgment to maximize the likelihood of success on appeal.  *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983). Furthermore, counsel may exclude a nonfrivolous claim if it was unlikely to prevail on appeal.  *See Anderson v. Quarterman*, 204 F. App'x 402, 410 (5th Cir.

2006) (failure to raise meritless claims did not prejudice petitioner); *Penson v. Ohio*, 488 U.S. 75, 83-84 (1988) (noting that courts have refused to find counsel ineffective when the proposed appellate issues are meritless). Therefore, because appellate counsel's essential duty is to focus on arguments that are most likely to succeed on appeal, counsel will not be found constitutionally ineffective for failure to raise every conceivable issue. *Smith*, 538 U.S. at 288; *Jones*, 463 U.S. at 754.

Here, it is clear that both the issues that Ferguson raises in regard to this claim lack merit. As previously discussed, the confrontation claim is meritless, as is the insufficiency of the evidence claim, which will be discussed below. As both of these issues clearly would not have succeeded on direct appeal, Ferguson fails to demonstrate the prejudice necessary to satisfy the *Strickland* standard on appeal. Thus, the state courts' denial of relief on this claim was neither contrary to, nor an unreasonable application of, federal law. Ferguson is not entitled to federal *habeas corpus* relief on this claim.

### 7. Insufficient evidence to sustain the conviction

Finally, Ferguson also asserts that there is insufficient evidence to sustain his conviction. He raised this claim for the first time in his application for post-conviction relief in the state district court. The state district court rejected the claim, stating that it did not fall within the list of grounds enumerated for post-conviction relief in Louisiana Code of Criminal Procedure article 930(3).[40]

Despite the state court's refusal to address this claim on procedural grounds, the State's response correctly notes that the claim is not procedurally defaulted because the

---

[40]*Id.*

procedural rule applied to bar insufficiency of the evidence claims is not firmly established and consistently followed in the Louisiana State courts. Therefore, it does not constitute an adequate and independent state law ground sufficient to bar *habeas* review.

However, because the State court did not address the merits of the claim, this court reviews Ferguson's claim *de novo*, as the state court's decision is not entitled to deference under the AEDPA. *Cone v. Bell*, 556 U.S. 449, 471 (2009) (where claim not adjudicated on the merits in State court proceeding, federal habeas review is not subject to deferential standard that applies under AEDPA, rather the claim is reviewed *de novo*). Even under *de novo* review, however, this claim must fail.

Claims of insufficient evidence are to be analyzed pursuant to the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), which held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. Importantly, "[t]he *Jackson* inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) (quoting *Herrera v. Collins*, 506 U.S. 390, 402 (1993)). Therefore, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.... Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Cavazos v. Smith*, --- U.S. ----, ----, 132 S.Ct. 2, 4, 181

L.Ed.2d 311 (2011).   Moreover, as the United States Fifth Circuit Court of Appeals has observed: "[A] state prisoner's burden is especially heavy on habeas review of the sufficiency of the evidence.   The jury's finding of facts will be overturned only when necessary to preserve the fundamental protection of due process of law."  *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir. 2008) (quotation marks omitted).

Here, Ferguson has failed to meet his burden on this claim.   Ferguson was convicted of first-degree murder, which is defined, in relevant part, under Louisiana law as follows:

> A. First degree murder is the killing of a human being:
> (1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, second degree kidnapping, aggravated escape, aggravated arson, *aggravated rape*, forcible rape, aggravated burglary, armed robbery, assault by drive-by shooting, first degree robbery, second degree robbery, simple robbery, terrorism, cruelty to juveniles, or second degree cruelty to juveniles.

La. R.S. 14:30(A) (emphasis added).

> Aggravated rape is defined as:

> A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:(1) *When the victim resists the act to the utmost, but whose resistance is overcome by force.* (2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution. (3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon. (4) When the victim is under the age of thirteen years. Lack of knowledge of the victim's age shall not be a defense. (5) When two or more offenders participated in the act. (6) *When the victim is prevented from resisting the act because the victim suffers from a physical or mental infirmity preventing such resistance.*

La. Rev. Stat. Ann. 14:42(A) (emphasis added).

The State's theory of the case was that Ferguson killed his daughter while committing or attempting to commit aggravated rape upon her.  Under Louisiana law, specific intent may be inferred from the circumstances and acts of the defendant.  *State v . Harrison*, 16 So.3d 447, 457 (La. App. 4 Cir. 2009) (citing *State v. Boyer*, 406 So. 2d 143 (La. 1981)).  Ferguson concedes as much in his federal petition ("Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant")[41] yet asserts that the State failed to prove this element, as well as the aggravated rape.

To the contrary, the testimony at trial established that Ferguson's daughter died of manual strangulation and that her vagina, uterus and surrounding ligaments showed signs of intense and recent trauma.  The victim's blood was found on Ferguson's clothing, and he was found with the victim at the scene of the crime.  Eyewitnesses throughout the night had seen them together, and a State Trooper had previously taken them off the highway and dropped them off a short distance from the scene of the crime.  Finally, Ferguson's own mother testified that she heard the victim screaming when she called Ferguson's cell phone close to the time of her death.

Considering the above evidence, a rational trier of fact could have concluded that Ferguson strangled his daughter to death while or after raping her.  Further, it was clear from the record that his daughter had a mental infirmity that might prevent such resistance–and in the alternative, a rational jury could conclude that she had resisted to the utmost but was overcome by Ferguson's force.  Based on the record before it, there was sufficient, albeit mostly circumstantial, evidence–along with the direct evidence of the

---

[41]Rec. Doc. No. 4-1, Memorandum in support.

victim's blood on Ferguson's clothing and seminal fluid in his underwear–for a rational jury to find the essential elements of this crime.  Therefore, Ferguson is not entitled to federal *habeas corpus* relief on this claim.

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Barry Ferguson be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).[42]

New Orleans, Louisiana, this 27th day of _____ April _____ 2015.

MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

---

[42]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.

47